## RHODE ISLAND & CONNECTICUT TURNPIKE SOCIETY *v.* ALBERT W. HARRIS & others.

The toll-rate clause in the charter of a turnpike company provided, that for each passage over the company's road, which was a post-road, "a coach, chariot, or phæton," should pay a toll of thirty-three cents, but a "mail-stage" only six cents. *Held*, that in the sense of the charter, and for the purpose of ascertaining the rate of toll, a coach was a "mail stage," when it actually carried the public mail over the road under a temporary arrangement, fairly made with the post-office department, through a deputy postmaster, for the public convenience, and not for the mere purpose of evading the higher rate of toll; and that it was not competent for the company to insist that the contract was not in writing, or did not in the manner of making it conform to the directions of the acts of congress, with regard to regular mail contracts, for the purpose of exacting the higher rate of toll.

ASSUMPSIT to recover the sum of one hundred and twenty-nine dollars and thirty-six cents for tolls due from the defendants for the passing of their daily stage-coach over the plaintiffs' turnpike road from the 25th day of September, 1855, to the 10th day of May, 1856. The charge was at the rate of

thirty-three cents per passage. Plea, the general issue, and tender of $30.21, being for the same number of tolls at the lower rate of six cents per passage; the plaintiffs accepting the sum tendered in part only, and pursuing their action for the difference between the amount tendered and the amount claimed.

At the trial of the cause before Mr. Justice *Shearman* with a jury, at the December term of the court of common pleas for the county of Providence, 1858, it appeared, that in 1803, the plaintiffs were incorporated by the general assembly for the purpose of establishing and maintaining a turnpike road from Providence to the Connecticut line, through the towns of Johnston, Scituate, and Foster; and that by the third section of their act of incorporation it was provided that amongst other tolls, they should be entitled to receive at their toll-houses on their road, "for a coach, chariot, or phæton, thirty-three cents;" "mail-stage, six cents;" that during the time for which the plaintiffs claimed tolls at the rate of thirty-three cents a passage for the passage of a daily coach run by the defendants upon their road, which was a post-road, said coach gratuitously carried a daily mail over it from Providence to North Scituate, under a verbal arrangement, entered into in October, 1855, between Welcome B. Sayles, postmaster at Providence and a special post-office agent, and the defendants, for the convenience, as was alleged, of the people of North Scituate; that, in pursuance of this arrangement, mails were daily made up, forwarded from, and received at, the post-office at Providence, by the coach of the defendants, and that this service was performed by them until the next regular lettings of the contracts for the carriage of the mails in July, 1857, the arrangement being intermediate between these lettings, and those which regularly took place four years before; that at the time when this arrangement was made, and during its whole continuance, there was a regular contract for the carriage of the mail from Providence to North Killingly, passing through North Scituate, between the post-office department and one Richards, at specified hours, the purpose of the new arrangement with the defendants being to have a daily mail at different hours, so that the people of North Scituate could daily write to the city in the morning and receive an

answer at night; that the arrangement between the agent of the post-office and the defendants was for no definite time, but at the will of the post-office department and the defendants. Some notice to give it up, but what did not appear, was required, and the arrangement certainly was not to extend beyond the next regular lettings; such temporary and intermediate contracts being frequently made, as sworn by Mr. Sayles, the agent, by the post-office agents, he himself having made them several times; that on the 25th day of April, 1856, upon some objection made by Richards, the regular contractor for the carriage of the mail upon the route, written notice was given by Sayles to the post-office department of the arrangement which he had made with the defendants, and the question of the continuance of this voluntary mail was submitted by him to the decision of the department, and on the 5th day of May, 1856, he received a reply from the contract office of the department, in which it was stated, in substance, that as they could not see how under the circumstances the contractor could be injured by the arrangement, they therefore could see no good reason why he should object to the citizens of North Scituate being accommodated with a mail at hours when he was not by his contract obliged to run his stages. Evidence was submitted, on one side, to show that the purpose of the arrangement was merely to enable the defendants to avoid the rate of tolls proper to their coach by making the coach, colorably, a mailcoach, and on the other, that its purpose was to give proper mail facilities to the people of North Scituate.

Upon this state of facts the plaintiffs requested the court to charge the jury, that under the post-office laws, Sayles, as a deputy-postmaster, or special agent, had no power to make a contract for carrying the mail; and if he had, could make such a contract as was set up only in writing; and that the act incorporating the plaintiffs, could not be construed to apply to the stages of the defendants, as mail-stages, where a contractor passed over the same route carrying the mail under a regular contract, if they had made an agreement to carry a mail without compensation from government, or otherwise, with the intent and for the purpose of saving tolls upon the turnpike road of

the defendants. The court refused, however, to instruct the jury as requested, but did, in substance, instruct them, that although Sayles, as deputy-postmaster at Providence, had no power to make the contract or arrangement in question, yet if in that capacity, or in any other, he did make it with the defendants in good faith for the mail accommodation of the people of North Scituate, and not solely for the purpose of enabling the coaches of the defendants to pass over the plaintiffs' road at a lower toll, and such arrangement was made known to the postmaster-general, and was by him ratified and approved, it made the coaches of the defendants, carrying the mail under such arrangement, mail-stages within the meaning of the charter of the plaintiffs, and liable to pay for each passage only six cents as toll; that there was no necessity for the said contract, or arrangement being reduced to writing; and further, that if the jury believed from the evidence that Sayles, as special post-office agent, made the arrangement in good faith, as aforesaid, and the same was made known to, and approved by, the post-office department, or the mail being carried by the defendants to the knowledge of the department, no objection was made to the same, the contract or arrangement was a valid contract; and if the mail was carried by the defendants under it, in the defendants' stage, it made the same a mail-stage; that the whole matter of the carriage of the mails over post-routes being confided by law to the discretion of the postmaster-general, his discretion could be inquired into collaterally only in case of want of power in him to make the contract, or fraud practised upon him in procuring it; but if the jury were satisfied that fraud was practised upon him in procuring the contract, they would be justified in finding against it; otherwise it was a valid contract, and made the stage of the defendants a mail-stage, and as such entitled to the partial exemption from toll provided by the plaintiffs' charter.

Under these instructions, it being agreed that the defendants had tendered to the plaintiffs, and the plaintiffs had received all that was due if the plaintiffs were entitled only to the lower rate of toll due to a mail-stage, the jury returned a verdict for the defendants; whereupon the defendants excepted to the

above instructions as erroneous in matter of law, and brought their exceptions to this court for the correction of the errors therein.

*T. C. Greene & R. W. Greene,* for the plaintiffs.

1. Welcome B. Sayles, neither as postmaster of the city of Providence, nor as a special agent of the post-office department, had power to make a valid contract with the defendants for the transportation of the mail. Mail contracts are made by the postmaster-general; but any supposed ratification by the postmaster-general of the contract made between Sayles and the defendants, cannot make said contract a valid one, for there is no power vested in the postmaster-general himself, either to make or to ratify a contract, of the character and description of the one set up by defendants. See 5 Stats. at Large, 85, § 23; Brightly's Dig. 776, § 117, to show what temporary contracts the postmaster-general may make. See also Brightly's Dig. 776, § 113. Sections relating to special agents are in Brightly's Dig. 761, §§ 19–21.

2. The charter of the company contemplates a fair and reasonable use of their road for the transportation of the mail, but the provisions of the charter should not be construed to apply to stages running under contracts of the kind set up by the defendants. Opinion of *Taney,* C. J., in *Searight* v. *Stokes et al.* 3 How. 171.

*Browne,* for the defendants.

The question in this case is, whether the defendants' stage was a mail-stage. The route was a post-route. 9 U. S. Stats. at Large, 188; 10 Ib. 364. The postmaster-general is authorized to provide for the carriage of the mail on post-roads. 4 U. S. Stats. at Large, 101, (Act of March 3, 1825); 5 Ib. 586; 6 Peters, 691, 729. Post-Office Regulations and Laws of 1857, p. 1, ch. 1, § 1. Also, § 9, p. 4. A deputy-postmaster has power between regular lettings to make temporary contracts without advertising. Section 42, page 9, Laws and Regulations of Post-Office. This need not be authorized beforehand, but may be ratified. The postmaster-general must, of course, use agents, and hence, has *ex necessitate rei* power to appoint them. 2 Brock. 280. The defendants are mail-carriers in fact and in law. 4 U. S.

Stats. 107, § 21; *United States* v. *Belew*, 2 Brock. 280. The fact that the carrier is not sworn, does not vitiate the proceedings. 4 U. S. Stats. 102. The decision of the post-office department is conclusive on this point. *United States* v. *Arredondo & others*, 6 Peters, 691.

AMES, C. J. It cannot be pretended that this arrangement, made between the deputy-postmaster at Providence and the defendants, for the carriage of the mail in their coaches from Providence to North Scituate and back, without compensation, conformed, in the manner of making it, to the directions given in the acts of congress for the making of regular contracts for the carriage of the mails. The arrangement professed to be temporary only, — determinable upon reasonable notice at the will of either party, — and, providing for no compensation, can scarcely be deemed to come within the spirit of those directions as to advertising for proposals which were prescribed by congress to avoid favoritism in the letting of mail contracts, and to ensure economy in this branch of the public service. The postmaster-general, who is·expressly authorized to provide for the carriage of the mails, undoubtedly has, and from the very nature of the case must have, power to make temporary arrangements for this service in the intervals of the regular or permanent lettings. Indeed, the proviso at the end of the 23d section of the act of July 2, 1836, (5 U. S. Stats. at Large, 86,) expressly saves this power of the postmaster-general until a regular letting can take place. The numerous accidents to which this service is exposed, — the numerous unforeseen changes in it, — and the regularity with which the public convenience, not to say, necessity, requires it to be performed, not only demands such a power in the postmaster-general, but the exercise of it through a general authority communicated to his deputies and agents, subject always, for the continuance of the arrangement, to his approval. The field of the service is so extensive, that it is impossible that special· authority should be communicated in every instance from the department at Washington, in season to meet every emergency. The case before us does not, however, in our judgment, require us to decide whether the sections of the act of March 3, 1825, and of July 2, 1836,

relating to advertisements for proposals, are merely directory to the postmaster-general, or are absolutely necessary to be observed by him in order to the validity of a mail contract; or, whether, if thus necessary, a temporary arrangement to carry the mail without compensation, like that before us, comes within the spirit of those sections. Some latitude must undoubtedly be allowed in the practical working of so great a machine as the post-office department; and would undoubtedly be allowed by congress in the exercise of its control over the department through the power of appropriation. How much latitude would or should be allowed in this respect by the courts, before whom such contracts can, in general, only collaterally come, we have no guide, and prefer, if we can, to leave to those courts whose construction of acts of congress carries with it the weight of authority.

In the sense of the act incorporating the plaintiffs as a turnpike company, that, in our view, is a mail-stage which, with the allowance of the post-office department, carries the public mail over their road for the public convenience, and not merely as a fraudulent contrivance between the department or its subordinates, and the mail carrier, for the purpose of evading the prescribed rate of tolls. So that the contract be fairly made for the public good and the mail be carried over their road, it is no concern of the plaintiffs whether there be a place in the contract, under the acts of congress, which will enable either party to escape from its obligation. The purpose of the exemption was, to encourage and invite mail service upon the road for the mutual benefit of the company and of our citizens; and this is equally answered, whether the mail contract in all respects conforms to the acts of congress, or not. Such, in common parlance, is the meaning of the term, "mail stage;" and we have no reason to suppose that the general assembly, in granting this charter, or the company in accepting it, understood the phrase in any other than its common sense. Tolls are demandable upon the spot for each passage of a vehicle; and some palpable test of the rate to be demanded would seem to be far more appropriate than one depending upon legal refinements, applied to the validity of mail contracts, and upon the power of the

postmaster-general and his deputies and agents to make them, under long and involved acts of congress.

It is evident, from the proof reported in the bill of exceptions, that when this arrangement was, upon the objection of the regular mail contractor upon this route, reported by the deputy-postmaster who made it to the contract office of the department, it was approved, and its continuance permitted; and the jury who tried this cause must have found, looking at the instructions given to them, that it was so made, and that too, not for the mere purpose of enabling the defendants to evade a higher rate of toll upon the plaintiffs' road, but because required for the public convenience.

Without minutely going into the instructions given to the jury in the court below, in the view we have taken of the toll-rate clause of their charter, the plaintiffs have no cause to complain of these instructions, and we, therefore, overrule their exceptions to them.